UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

FILED
August 6, 2008
AUG - 6 2008
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

UNITED STATES OF AMERICA

v.

CARLOS A. CRUZ (also known as "Tony"),
JOEL D. PEREZ, ALEXANDER VASQUEZ Jr.

CRIMINAL COMPLAINT

CASE NUMBER: 08 CR 625

MAGISTRATE JUDGE COLE

I, James C. Chupik, being duly sworn, state the following is true and correct to the best of my knowledge and belief.

On or about August 5, 2008, in the Northern District of Illinois, Eastern Division, defendants did,

> conspire with each other to knowingly and intentionally possess with intent to distribute a controlled substance, namely, 500 grams or more of mixtures containing cocaine, a Schedule II Narcotic Drug Controlled Substance, in violation of Title 21, United States Code, Section 841(a)(1),

in violation of Title 21, United States Code, Section 846.

I further state that I am a Special Agent with the Drug Enforcement Administration and that this complaint is based on the following facts:

See attached affidavit.

Continued on the attached sheet and made a part hereof: X Yes ___ No

Signature of Complainant

Sworn to before me and subscribed in my presence,

August 6, 2008 at Chicago, Illinois
Date City and State

Jeffrey Cole, U.S. Magistrate Judge
Name & Title of Judicial Officer

Signature of Judicial Officer

UNITED STATES DISTRICT COURT )
) ss
NORTHERN DISTRICT OF ILLINOIS )

AFFIDAVIT

I, JAMES C. CHUPIK, being duly sworn, state as follows:

1. I am a Special Agent with the United States Drug Enforcement Administration ("DEA"), United States Department of Justice. I have been employed by the DEA since approximately January 2004 and I am currently assigned to an enforcement group within the DEA Chicago Field Division, Chicago, Illinois. Prior to my current employment, I was employed by the Norfolk (Virginia) Police Department in May 1996 and later assigned as a drug investigator with the Department's Narcotics Division from August 1998 to January 2004.

2. As a Special Agent, I am an "investigative or law enforcement officer" within the meaning of Section 2510(7) of Title 18, United States Code; that is, an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Title 18, United States Code, Section 2516.

3. My official DEA duties include investigating criminal violations of the federal narcotics laws, including, but not limited to, Title 21, United States Code, Sections 841, 843, 846 and 848. I have received special training in the enforcement of laws concerning controlled substances as found in Title 21 of the United States Code. Some of the specialized training I have received includes, but is not limited to, classroom instruction concerning narcotics smuggling, money laundering investigations and conspiracy and complex investigations. I have worked in several investigations involving various types of electronic surveillance, including the interception of wire communications, the debriefing of defendants, witnesses and informants, as well as others

who have knowledge of the distribution and transportation of controlled substances, the laundering and concealing of proceeds from drug trafficking and the street gangs who participate in these illegal activities.

4. I am familiar with the facts and information contained in this affidavit from my own personal observations, witness interviews, surveillance, review of video surveillance, analysis and review of documents and records, and discussions with other law enforcement agents and officers involved in this investigation. Because this affidavit is submitted solely for the purpose of establishing probable cause in support of a criminal complaint, the information contained herein is described in summary form and is not every fact known to me regarding this investigation. Where statements of others are set forth in this affidavit, they are set forth in substance and in part, and are not verbatim. Statements from recorded conversations do not include all statements or topics covered during the course of the recorded conversation, and are not taken from a final transcript.[1]

5. Based on the information contained in this affidavit, I submit that there is probable cause to believe that on or about August 5, 2008, Carlos A. CRUZ, Joel D. PEREZ, and Alexander VASQUEZ Jr. conspired with each other to knowingly and intentionally possess with intent to distribute controlled substances, namely 500 grams or more of mixtures containing cocaine, in violation of 21 U.S.C. § 846.

---

1 The words included with quotation marks are based on summaries, and not final transcript. At various points in the affidavit, I will set forth in brackets or otherwise my understanding of coded words and phrases used during the recorded conversations. My understanding of these coded words and phrases is based on my training and experience, my knowledge of this investigation as a whole, and information provided by the confidential source ("CS") described herein.

**Recorded Calls Between Confidential Source and CRUZ**

6. On or about August 4, 2008, at approximately 4:25 p.m., a cooperating source ("CS")[2] had a consensually recorded call with a person known only to the CS as "Tony" who was later identified as CRUZ at cellular telephone number (773) 865-4913 (hereafter the "CRUZ Telephone Number").

7. During the recorded conversation, CS advised CRUZ, "It's really good" and CRUZ responded, "ceramic?...let me call...what's the number?" (CS told CRUZ that he/she had access to kilograms of cocaine and informed CRUZ that the quality was "really good." CRUZ confirmed that it was cocaine ("ceramic") and then told CS that he was going to call his cocaine customers). Lastly, CRUZ asked CS how much one kilogram of cocaine would cost ("what's the number"). CS then advised CRUZ, "twenty-three." CRUZ responded, "let me call them to give them the number that I'm going to charge them" (CS told CRUZ that the purchase price for the cocaine would be $23,000 per kilogram. CRUZ acknowledged and told CS that he would call his cocaine customers and inform them of the price). CS then told CRUZ, "he lives in Arlington...that's where he has the tools" (CS told CRUZ that the alleged source of supply who could supply them with kilograms of cocaine was located in Arlington Heights). CRUZ then asked, "It's up north?"and CS responded, "Arlington...is Touhy, west of River Road...let me know" (CRUZ wanted to confirm where he and his cocaine customers would have to come to pick up the kilogram and CS affirmed in Arlington Heights, near "Touhy...west of River Road"). CRUZ then told CS, "It will get done...I

[2] The CS expects to be indicted with narcotics-related charges and is cooperating in the hope of receiving a reduced sentence on such charges. In 2003, CS was convicted on Illinois States charges for manufacturing and delivery of cocaine. CS has also been arrested for additional narcotics violations and battery offenses, but was not convicted.

just need to call" (CRUZ assured CS that he and his cocaine customers definitely wanted to purchase one kilogram of cocaine and that he just needed to call the customers and inform them of the purchase price).

8. On or about August 5, 2008, at approximately 10:25 a.m., the CS had a consensually recorded call with CRUZ at cellular telephone number (773) 865-4913. During the recorded conversation, CRUZ told CS, "He's going to give me 'twenty-four'...there's mine and there is yours...we're good" (CRUZ advised CS that his cocaine customers were going to give him $24,000 for the kilogram of cocaine that they intended to receive from CS and that the difference, $1,000, would be he and CS's profit, "there's mine and there is yours"). CS affirmed.

9. On this same date, at approximately 1:41 p.m., the CS had a consensually recorded call with CRUZ at cellular telephone number (773) 865-4913. During the recorded conversation, CRUZ told CS that he was finishing up at work and that, "by the time I get home...call him...by 3:00 p.m. I'll be there with you already" (CRUZ would go home from work, call the cocaine customer, and be in Arlington Heights by 3:00 p.m. to purchase the negotiated kilogram of cocaine).

10. On this same date, at approximately 3:57 p.m., the CS had a consensually recorded call with CRUZ at cellular telephone number (773) 865-4913. During the recorded conversation, CRUZ asked CS for directions to the location where he and his cocaine customers should come to purchase the kilogram of cocaine. CS provided CRUZ with directions to Arlington Heights Road and asked that CRUZ call CS when he (CRUZ) was getting off of Interstate 90. CRUZ agreed.

11. On this same date, at approximately 4:46 p.m., the DEA monitored a consensually recorded call between CS and CRUZ at cellular telephone number (773) 865-4913.

During their conversation, CRUZ advised CS that he and his cocaine customers were "on the way"and that they were at "Irving Park and Harlem" (CRUZ and his cocaine customers were leaving Harlem Avenue and Irving Park Road, in Chicago, Illinois and were on their way to meet with CS). CRUZ advised CS that he would call "when I'm on the expressway" (CRUZ would call CS once he and the customers were on I-90).

12. At approximately 5:10 p.m. the DEA monitored a call from CRUZ at cellular telephone number (773) 865-4913 to CS. During this call, CRUZ told CS that he had just gotten on to the expressway, meaning Interstate 90 westbound.

**The Meeting Between CS, CRUZ, VASQUEZ, and PEREZ on August 5, 2008**

13. At approximately 5:20 p.m., the DEA equipped CS with a digital recording device to be worn by CS during his/her meeting with CRUZ, VASQUEZ, and PEREZ. CS was directed to meet with CRUZ at the Shell gas station, located on the northwest corner of Arlington Heights Road and Algonquin Road, (the "Shell Station") on Arlington Heights Road.

14. Agents then followed CS who drove directly to the Shell Station.

15. At approximately 5:26 p.m., CS arrived at the Shell Station and parked in the northwest corner of the parking lot. At approximately 5:28 p.m., surveillance agents ("Surveillance") observed a Hispanic male, later identified as VASQUEZ, arrive and park in the Denny's Restaurant parking lot, located directly west and close to where CS was parked. VASQUEZ was driving a black Pontiac sedan. At this same time, agents observed CRUZ, who was accompanied by a Hispanic male, later identified as PEREZ, arrive in a silver Dodge Nitro and park directly next to CS's vehicle. CRUZ and PEREZ got out and spoke with CS briefly and then walked approximately twenty feet into the Denny's restaurant parking lot and met up with VASQUEZ.

PEREZ got into the front passenger seat of VASQUEZ'S vehicle while CRUZ remained outside, standing next to the Pontiac's front passenger side door.

16. Once CRUZ and PEREZ walked away from CS's vehicle, CS departed the Shell gas station and was debriefed by agents. CS stated that CRUZ and PEREZ arrived in the Dodge Nitro and that another Hispanic male, unknown to CS, arrived simultaneously in a black car located behind them in the Denny's restaurant parking lot. CS stated that CRUZ and PEREZ had approached his/her vehicle's passenger's-side door and advised that they were ready to complete the negotiated purchase of one kilogram of cocaine. CS stated that he/she directed CRUZ and PEREZ to follow him/her to where the cocaine was located and that CRUZ and PEREZ agreed. However, CS stated that CRUZ and PEREZ did not follow when he/she exited the Shell gas station parking lot. Instead, CS stated that CRUZ and PEREZ walked from their location towards VASQUEZ and the black car. CS stated that he/ she then contacted CRUZ at cellular telephone number (773) 865-4913 to ask why they didn't follow. During their conversation, CS stated that CRUZ informed him/her that "they" (VASQUEZ and PEREZ) did not want to follow CS to pick up the kilogram of cocaine. CRUZ requested that CS go retrieve the kilogram of cocaine and then return with it to the Shell gas station so that they could complete the sale.

**The Arrest of CRUZ, VASQUEZ, and PEREZ**

17. At approximately 5:30 p.m., DEA agents and members of the Arlington Heights Police Department (collectively, "law enforcement") entered the Denny's restaurant parking lot to arrest CRUZ, PEREZ, and VASQUEZ. When law enforcement pulled into the Denny's restaurant parking lot, they parked their police cars, with lights and sirens activated, behind PEREZ and VASQUEZ'S Pontiac and began exiting their vehicles. All law enforcement involved loudly

identified their presence as "Police" or "DEA" agents and were wearing attire which displayed their positions as either "Police" officers or "DEA" agents.

18. When law enforcement entered the parking lot, CRUZ was standing outside and next to the black Pontiac. CRUZ complied with the commands issued by law enforcement and was taken into custody without incident.

19. When law enforcement entered the parking lot, VASQUEZ and PEREZ were sitting in the black Pontiac that VASQUEZ had parked in the parking lot. As the agents and officers were exiting their cars, VASQUEZ, who was sitting in the driver's side, put his vehicle in reverse and repeatedly rammed at least two police cars and narrowly missed striking one DEA agent before VASQUEZ and PEREZ successfully escaped in their vehicle.

20. A short time later, law enforcement located VASQUEZ and PEREZ'S vehicle in a Wal-mart parking lot, which is located on West Algonquin Road, in Rolling Meadows, Illinois, and located VASQUEZ and PEREZ who were inside a nearby McDonald's restaurant. Upon law enforcement entering the McDonald's restaurant, VASQUEZ and PEREZ fled from the restaurant on foot in separate directions. Law enforcement followed both VASQUEZ and PEREZ and apprehended both without further incident. Once PEREZ was in custody, the DEA recovered two cellular telephones, bearing telephone numbers (773) 310-8098 and (773) 910-0452, from the ground near where PEREZ was apprehended and along the path which he had taken from the McDonald's restaurant. Both phones were operational and turned on. Agents recorded the "Recent Calls" log from both cellular telephones. Surveillance later identified PEREZ and VASQUEZ as the individuals seen meeting with CS and CRUZ earlier on August 5, 2008.

21. Later, a narcotics canine trained in the detection of narcotics odors was

deployed around and inside the black Pontiac. The canine alerted positively for the presence of narcotics odors within the vehicle. A subsequent detailed search of the Pontiac resulted in the seizure of a large sum of United States Currency which was concealed in a hidden compartment located in the passenger's side dashboard where the airbag would normally be contained. DEA policy dictates that agents are not permitted to conduct manual counts of narcotics proceeds and are required to transport the money to a financial entity for an accurate count, but agents believe, based on the number of individually wrapped bundles of money contained in the hidden compartment, that the total amount seized is in excess of $20,000.

22. On August 6, 2008, the DEA conducted queries of the Illinois Secretary of State Records and the Lexis/Nexis Public Information Database for ALEXANDER VASQUEZ JR. and the black Pontiac Bonneville which he drove and which was found to contain United States Currency contained in a hidden compartment. A query for the Pontiac's Illinois license plate, X193324, revealed that it is registered to a Mayra Vasquez at 7554 West Forest Preserve, in Chicago, Illinois, date of birth January 15, 1990. However, a query of Mayra Vasquez's Illinois driver's license, number V22054090615, revealed that she resides at 7550 West Forest Preserve, in Chicago, Illinois. Additionally, a query for known residences for ALEXANDER VASQUEZ revealed that he resided at 7550 West Forest Preserve Avenue between April 2002 and June 2008 and at 7554 West Forest Preserve Avenue between November 2003 and June 2008.

**<u>Analysis of "Recent Calls" Log for Cellular Telephones (773) 310-8098 and (773) 910-0452</u>**

23. An analysis of the incoming and outgoing calls made to/from (773) 310-8098, one of the two cellular telephones found near where PEREZ was apprehended, revealed the following contacts between (773) 310-8098 and the CRUZ Telephone Number. On August 5, 2008,

at approximately 11:30 a.m., cellular telephone number (773) 310-8098 placed an outgoing call lasting one minute and thirty nine seconds to the CRUZ Telephone Number. Cellular telephone number (773) 310-8098 received two incoming calls from the CRUZ Telephone Number at 11:57 a.m. and 1:44 p.m. on August 5, 2008. The duration of these calls were two minutes and fourteen seconds and two minutes and one second, respectively. The call received by (773) 310-8098 at 1:44 p.m. occurred approximately 3 minutes after the call described in paragraph 9 during which CRUZ told CS that he was finishing up at work and that he would soon be calling his cocaine customer so that he could later complete the negotiated cocaine transaction.

24. An analysis of the incoming and outgoing calls made to/from (773) 910-0452, the other cellular telephone found near where PEREZ was apprehended, revealed the following contacts with the CRUZ Telephone Number. On August 5, 2008, (773) 910-0452 placed or received a total of twelve (12) calls to/from the CRUZ Telephone Number between approximately 11:38 a.m. and 5:33 p.m. One of these contacts, which occurred at approximately 4:25 p.m., occurred just minutes before CRUZ contacted CS to advised that he and the cocaine customers on their way to Arlington Heights to complete the cocaine transaction.

**Statement of CRUZ on August 5, 2008**

25. On August 5, 2008, at approximately 8:15 p.m., agents of the DEA read CRUZ his *Miranda* Warnings from an Arlington Heights Police Department form. CRUZ advised agents, "I'm on parole...I understand my rights and I'll talk to you, but I'm not signing anything in writing."

26. CRUZ then stated that he was recently contacted by a subject who he knows only as "Alex" (meaning CS) and that "Alex" informed him that he had access to kilograms of

cocaine for $23,000 each. CRUZ stated that he works a legitimate job during the day, but that he occasionally "brokers" narcotics transactions between sources of supply and customers to earn additional money. CRUZ stated that, on August 5, 2008, he contacted a known cocaine distributor and offered to arrange for him to purchase one kilogram of cocaine from "Alex." CRUZ refused to positively identify who he contacted, but later admitted that the two subjects who were arrested with him, PEREZ and VASQUEZ, were the customers during this transaction. CRUZ stated that he usually gets off from work at approximately 2:00 p.m. and that on this date he contacted either PEREZ or VASQUEZ and arranged to meet them in Chicago, Illinois. CRUZ stated that he met with VASQUEZ and PEREZ just before coming to Arlington Heights and that he, PEREZ (who CRUZ said was in his car), and VASQUEZ (who CRUZ said drove the black car) drove to Arlington Heights to purchase one kilogram of cocaine from "Alex." CRUZ denied that he was going to earn any profit for arranging for this transaction. CRUZ added that he never saw PEREZ and VASQUEZ's money, but that they assured him that they did have it with them when they traveled to Arlington Heights.

27. Based on the foregoing, I submit that there is probable cause to believe that on or about August 5, 2008, Carlos A. CRUZ, Joel D. PEREZ, and Alexander VASQUEZ Jr. conspired with each other and with others unknown to knowingly and intentionally possess with intent to distribute controlled substances, namely 500 grams or more of mixtures containing cocaine, in violation of 21 U.S.C. § 846.

FURTHER AFFIANT SAYETH NOT.

James C. Chupik
Special Agent
Drug Enforcement Administration

Subscribed and sworn before me
this 6th day of August, 2008

Hon. Jeffrey Cole
United States Magistrate Judge